IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

TERRIE L. RUNION, individually and
as Administratrix of the Estate of
Ashleigh Runion,

           Plaintiff,

v.                                      CIVIL ACTION NO. 3:12-2540

WASHINGTON NATIONAL INSURANCE
COMPANY,

           Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending are the parties' cross-motions for summary judgment on Count One of the complaint. ECF No. 20 (Defendant's motion); ECF No. 24 (Plaintiff's motion). Plaintiff, the administratrix of the estate of her deceased daughter, Ashleigh Runion ("Ms. Runion"), seeks a declaratory judgment that accidental death benefits are payable pursuant to a life insurance policy issued by Conseco Life Insurance Company. Defendant[1] argues that the terms of its policy specifically exclude accidental death coverage for Ms. Runion's death and asks the Court to enter judgment in its favor. For the reasons stated below, the Court **GRANTS** Defendant's motion for summary judgment and **DENIES** Plaintiff's motion.

---

[1] Plaintiff originally named Conseco Life Insurance Company as defendant. On May 30, 2013, the Court entered an order substituting Washington National Insurance Company as the real party in interest, based upon the 2010 merger of the two companies. ECF No. 27. For simplicity, the Court will use the singular "Defendant."

## I.     BACKGROUND

This case arises from an automobile collision that tragically resulted in the death of Ashleigh Runion and her 10-month-old son.[2] The relevant facts surrounding the collision are uncontested.[3] On the morning of July 4, 2010, Ms. Runion was operating a motor vehicle traveling southbound on U.S. Route 35 in Putnam County, West Virginia. Her son was in the front passenger seat without a child safety seat. Neither was wearing a seat belt. Witnesses observed Ms. Runion's vehicle cross the center line into the northbound lane, going against the flow of traffic. One northbound vehicle ran off the road to avoid a collision with Ms. Runion's vehicle. Ms. Runion's vehicle continued driving the wrong way in the northbound lane, towards an oncoming tractor trailer. In an apparent attempt to avoid collision, the tractor trailer began to move into the southbound lane. Ms. Runion's vehicle, however, then moved back to the proper lane and collided with the tractor trailer. She and her son were pronounced dead at the scene.

The Office of the Medical Examiner performed a post-mortem examination of Ms. Runion's body to determine the cause of death. *See* Ex. 1F, Def.'s Mot. Summ. J., ECF No. 20-3. The examination included a blood and urine toxicology analysis. Ex. 1B, Def.'s Mot. Summ. J., ECF No. 30-1. The medical examiner identified the immediate cause of death as "multiple injuries" due to a motor vehicle collision. Ex. 1F, ECF No. 20-3. He further noted on Ms. Runion's death certificate that another "significant condition contributing to death" was "operator impairment," specifically "oxycodone intoxication." *Id.* The toxicology report states that Ms.

---

[2] This is the second action Plaintiff filed on a life insurance policy arising from Ms. Runion's death. In both cases, Plaintiff seeks a declaratory judgment that accidental death insurance benefits are payable under the policy. Both cases are pending before this Court. On June 6, 2013, the Court granted summary judgment for the defendant in Plaintiff's first action, *Runion v. Minnesota Life Insurance Company*, No. 3:12-cv-02538 (S.D. W. Va. filed July 3, 2012). The policy at issue in that case involved a coverage exception similar to that at issue here.

[3] These facts are taken from the Traffic Crash Report, Ex. 4, Pl.'s Mot. Summ J., ECF No. 24-4.

Runion's blood contained oxycodone in a concentration of 0.27 mg/L. Ex. 1B, ECF No. 30-1. The report identified a "therapeutic" concentration of oxycodone to be within the range 0.01 mg/L to 0.10 mg/L, and a level in excess of .10 mg/L is considered toxic. *Id.* The report noted that "[t]he narcotic analgesic oxycodone was present in the blood at a concentration that can cause toxicity in those who do not have tolerance to opiate medications." *Id.*

Approximately three months before her death, Ms. Runion purchased a life insurance policy issued by Defendant. Ex. 1A, Def.'s Mot. Summ. J., ECF No. 30-1. The policy provided coverage for accidental death and dismemberment with disability. After Ms. Runion's death, Plaintiff submitted a claim for accidental death benefits, which Defendant denied. Ex. 6, Pl.'s Mot. Summ J., ECF No. 24-6. Plaintiff thereafter filed this action, alleging that Defendant wrongfully denied Plaintiff's claim for accidental death benefits. Count One of the complaint seeks a declaratory judgment that the insurance policy provides accidental death coverage for Ms. Runion's death. Compl. ¶¶ 10-11. In Count Two, Plaintiff asserts a claim that Defendant violated the West Virginia Unfair Trade Practices Act, W. Va. Code § 33-11-4. Compl. ¶¶ 12-16. The parties have filed cross-motions for summary judgment on Count One of the complaint. With this background in mind, the Court now turns to the language of the policy, the parties' arguments, and the applicable legal standards.

## II. ANALYSIS

### A. Legal Standards

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242,

249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

The dispositive issue here is whether Ms. Runion's death qualifies as an accidental death under the terms of her life insurance policy, for which benefits are payable. It is a contract dispute. In a West Virginia action for declaratory judgment to determine the scope of coverage under a particular insurance policy, the plaintiff bears the burden of establishing a prima facie case that the claim falls within the scope of coverage. *Camden-Clark Mem'l Hosp. Ass'n v. St. Paul Fire & Marine Ins. Co.*, 682 S.E.2d 566, 574 (W. Va. 2009). Once a prima facie case has been established, the burden shifts to the insurer to demonstrate that an exclusion applies. *Id.* (citing Syl. Pt. 7, *Nat'l Mut. Ins. Co. v. McMahon & Sons, Inc.,* 356 S.E.2d 488 (W. Va. 1987), *modified on other grounds by, Potesta v. U.S. Fid. & Guar. Co.,* 504 S.E.2d 135 (W. Va. 1998)). Where "the policy language involved is exclusionary, it will be strictly construed against the insurer in order that the purpose of providing indemnity not be defeated." *Id.* (quoting Syl. Pt. 5, *McMahon,* 356 S.E.2d 488). Although insurance contracts are construed liberally in favor of the insured,

Syl., *Thompson v. State Automobile Mut. Ins. Co.*, 11 S.E.2d 849 (W. Va. 1940), "[w]here the provisions of an insurance policy contract are clear and unambiguous they are not subject to judicial construction or interpretation, but full effect will be given to the plain meaning intended." Syl., *Keffer v. Prudential Ins. Co. of Am.*, 172 S.E.2d 714 (W. Va. 1970).

### B.     Admissibility of Expert Report

As an initial matter, the Court must determine whether the expert report attached to Defendant's motion for summary judgment may be considered by the Court.  In support of its motion for summary judgment, Defendant offers the expert report of Alphonse Poklis, Ph.D.  Ex. 2, Def.'s Mot. Summ. J., ECF No. 20-4.  Plaintiff argues that this report should be excluded because it is not properly authenticated pursuant to Federal Rule of Civil Procedure 56 and because it is unreliable.   Plaintiff does not challenge Dr. Poklis's qualifications or ability to provide expert testimony.

The fact that the expert report was initially submitted without an authenticating affidavit does not mandate its exclusion.  Federal Rule of Civil Procedure 56(e)(1) states that "[i]f a party fails to properly support an assertion of fact . . . as required by Rule 56(c), the court may give an opportunity to properly support or address the fact."  In its response brief, Defendant offers a supplementary affidavit signed by Dr. Poklis, authenticating the report.  The Court now accepts this affidavit.  Therefore, because Defendant has properly supported its assertion of fact after being given the opportunity to do so, and because the expert report presented no unfair surprise or prejudice to Plaintiff, the Court will not reject Dr. Poklis's report on this ground.

Plaintiff next argues that Dr. Poklis's report should be excluded as unreliable because it is not based on sufficient facts, as required by Federal Rule of Evidence 702.[4] In his report, Dr. Poklis states, "There is no indication in the material reviewed that Ms. Runion was ever prescribed oxycodone at any time within several years of her death!" ECF No. 25-2 at 2 (exclamation in original). Ms. Runion's prescription records, however, indicate that she received one prescription for oxycodone on August 15, 2009. Ex. 9, Pl.'s Mot. Summ. J., ECF No. 24-9; Ex. 2, ECF No. 24-2. Plaintiff argues that this erroneous statement in the report demonstrates that it is unreliable as a whole and should be excluded from the Court's consideration. In response, Defendant claims that this particular prescription record was not produced in discovery and thus was unavailable to Dr. Poklis. The Court, however, need not venture into this discovery dispute to resolve this issue. Defendant submitted a rebuttal affidavit of Dr. Poklis, in which he stated that after becoming aware of this oxycodone prescription, his expert opinion is that "there is no way of knowing whether the Oxycodone Ashleigh Runion ingested in the hours before her death were from the prescription she was given on August 15, 2009, or whether she acquired the Oxycodone elsewhere." Ex. 7, Def.'s Resp., ECF No. 25-3, ¶ 6. His "opinions regarding Ashleigh Runion's severe impairment at the time of the accident," however, "remain unchanged." ECF No. 25-3 ¶ 12.

The Court concludes that the expert opinion of Dr. Poklis, as amended, is admissible. Plaintiff's only complaint about the report is that Dr. Poklis failed to properly review Ms. Runion's prescription history records. Dr. Poklis has amended his opinion in light of those prescription records. Plaintiff cites to the amended affidavit to support her position, ECF No. 28 at 2, but also

---

[4] Federal Rule of Evidence 702 states: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if . . . the testimony is based on sufficient facts or data." Fed. R. Evid. 702(b).

argues that the Court should not consider the rebuttal affidavit, ECF No. 28 at 8-9. Plaintiff cannot have it both ways. Moreover, Plaintiff does not challenge Dr. Poklis's other opinions in the report for lack of sufficient facts or data. For example, Plaintiff does not specifically dispute Dr. Poklis's conclusions regarding the amount of oxycodone Ms. Runion ingested, or the effects it had on her. It is these expert opinions that the Court finds most relevant to the dispositive issue in this case. Because the Court finds that Dr. Poklis's report as amended is based on sufficient facts, and Plaintiff does not challenge any other of his opinions as lacking sufficient basis, the Court will not exclude Dr. Poklis's expert report.[5]

### C. The Insurance Policy

The policy at issue in this case provides benefits to the insured if she suffers losses due to a covered accident, if the loss is not excluded under the provisions of the policy. Because the parties agree that the dispositive issue here is whether the policy exclusion applies, the Court will proceed directly to that analysis. In its letter denying benefits, Defendant invoked a policy exclusion for intoxication. Section 5 of the policy contains limitations and exclusions to coverage. It states:

> We will not pay benefits for Loss contributed to, caused by, or resulting from Your:
>
> **INTOXICATION**: Being Legally intoxicated, or so intoxicated that mental or physical abilities are seriously impaired, being under the influence of any illegal drugs, or being under the influence of any narcotic, unless such narcotic is taken under the direction of and as directed by a Physician.

Ex. 1A, ECF No. 30-1.

---

[5] Although the Court finds Dr. Poklis's report admissible and cites to it in this opinion, the Court would reach the same result even without the expert report. *See Runion v. Minn. Life Ins. Co.*, No. 3:12-cv-2538, 2013 WL 2458541 (S.D. W. Va. June 6, 2013).

7

The Court finds this exclusionary language clear and unambiguous and must give full effect to its plain meaning. Plaintiff's arguments that this language is ambiguous are unpersuasive. Plaintiff primarily argues that this provision is ambiguous because in order to apply, the insured must be "legally intoxicated," and West Virginia has not established a legal blood concentration threshold for oxycodone. This argument fails because it ignores the provision's subsequent clauses, each listed in the disjunctive. By its plain language, the provision excludes coverage in any of four separate circumstances: (1) the insured's being legally intoxicated; (2) the insured's being so intoxicated that abilities are seriously impaired; (3) the insured's being under the influence of any illegal drugs; (4) the insured's being under the influence of any narcotic. This fourth circumstance would *not* bar recovery of benefits if two conditions are *both* present: (a) the narcotic is taken *under the direction* of a physician; and (b) the narcotic is taken *as directed* by a physician. Additionally, causation is required: the loss must have been "contributed to, caused by, or resulting from" one of the four conditions. The Court finds that this language is unambiguous and thus its plain meaning will be given full effect.

In this case, two conditions of the intoxication exclusion potentially apply: the insured's being "so intoxicated that mental or physical abilities are seriously impaired," and "being under the influence of any narcotic." The Court will address each in turn.

### 1. Intoxication seriously impairing mental or physical abilities

The toxicology analysis performed after Ms. Runion's death revealed the presence of oxycodone in her blood at the time of the collision, in an amount approximately three times a therapeutic dose. ECF No. 24-8. The chief toxicologist commented that "[t]he narcotic analgesic oxycodone was present in the blood at a concentration that can cause toxicity in those who do not have tolerance to opiate medications." ECF No. 24-8. Plaintiff does not dispute the

8

toxicologist's conclusion, but argues that this concentration was not toxic to Ms. Runion because she had developed a tolerance to opiate medications from previous prescriptions. Plaintiff argues that Ms. Runion's prescription history included the following opiate medications: three tabs of oxycodone [6] while in the hospital delivering her son on August 13, 2009; forty tabs of oxycodone/APAP prescribed on August 15, 2009; and five prescriptions for the drug suboxone that Ms. Runion received between November 27, 2009 and January 3, 2010. Plaintiff also claims that some of Ms. Runion's other prescribed medications contained "opiates, similar active ingredients, and/or are similarly synthesized by the brain and can cause similar effects and adverse reactions as" oxycodone. ECF No. 24 at 13.

Although Plaintiff has produced evidence that Ms. Runion had ingested opioid medications in the past, there is no evidence that Ms. Runion had developed an opioid tolerance, or what the level of any tolerance may be. Plaintiff asks the Court to assume that Ms. Runion's prescription history made her tolerant to oxycodone such that the level detected in her blood at the time of her death did not have toxic effects on her. While the Court must draw all permissible inferences from the underlying facts in a favorable light to Plaintiff, Plaintiff must offer more than a scintilla of evidence in support of her position. She has produced no evidence that Ms. Runion was tolerant to opioid medications at the time of her death. There is no evidence from Ms. Runion's treating physicians that Ms. Runion had developed a tolerance. Additionally, her prescription records show that the amounts of opioid medications she received in each prescription did not change; her doctors did not increase the dosage over time.

---

[6] These tabs were a blend of 5 mg oxycodone HCL and 325 mg of acetaminophen. ECF No. 24-10. Plaintiff mistakenly states that Ms. Runion also received the medication "Oxycontin/DSLR" during that hospitalization, ECF No. 24 at 12; the records indicate that the medication was actually "oxytocin/DSLR," ECF No. 24-10, and not the narcotic oxycodone.

Meanwhile, Defendant has produced evidence showing that the amount of oxycodone in Ms. Runion's blood at the time of her death was toxic. First, the chief toxicologist stated that she had a blood concentration of oxycodone of 0.27 mg/L—nearly three times that of a therapeutic dose. ECF No. 24-8. Plaintiff does not contest the accuracy of these measurements. Second, Dr. Poklis opined that Ms. Runion's single prescription for oxycodone and her prescriptions for suboxone were "not sufficient in quantity or dosage for her to have acquired a tolerance to the influence of [the drugs] at any time, up to and including" the July 2010 collision. ECF No. 25-3 ¶ 10. Dr. Poklis also stated that Ms. Runion's blood concentration of oxycodone would have impaired her sensory-motor coordination and caused an increased reaction time. ECF No. 20-4 at 2. Plaintiff argues that the Court should disregard Dr. Poklis's opinion in its entirety for the reasons discussed above. Plaintiff does not, however, offer any evidence to refute Dr. Poklis's opinion, specifically on the issue of Ms. Runion's tolerance to oxycodone and the drug's physical effects. Plaintiff's arguments are not evidence. Moreover, Defendant is not bound by the high burden of proof required in criminal proceedings, because this is not a criminal prosecution. *See Kay-Woods v. Minn. Life Ins. Co.*, 622 F. Supp. 2d 704, 708-09 (S.D. Ill. 2009).

Defendant has also satisfied its burden of proving causation. The policy language here does not require the insured's intoxication to be the *sole* cause of death; the exclusion applies even if the intoxication "contributed to" the death. The toxicologist report, and Dr. Poklis's expert report, concluded that Ms. Runion was oxycodone-intoxicated at the time of the collision. Plaintiff does not argue, and there is no evidence, that there were any intervening causes or other contributing factors to the collision and deaths. While Plaintiff disputes the medical examiner's description of Ms. Runion as "oxycodone intoxicated," Plaintiff does not challenge the medical examiner's factual findings, nor does she offer evidence of any other biological explanation for

Ms. Runion's wrongful driving that the medical examiner may have neglected to consider, such as a stroke or other sudden physical impairment. Plaintiff does not dispute the testimony of several witnesses that Ms. Runion was driving in the wrong lane against the flow of traffic for a time long enough to force two vehicles to pull off the road or into a different lane to avoid her. *See* Police Report, Ex. 4, ECF No. 24-4. Thus, there is no evidence that Ms. Runion was driving in the wrong lane very briefly due to some momentary distraction wholly unrelated to the presence of drugs in her system. Accordingly, the Court concludes that there is no evidence from which a jury could find that Ms. Runion's death was not caused, at least in part, by her driving under the influence. *See Morgan v. Allianz Life Ins. Co. of N. Am.*, 976 F. Supp. 409, 414 (S.D. W. Va. 1997), *aff'd,* 151 F.3d 1029 (4th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)) ("More fundamentally, however, the Beneficiary cannot demonstrate a triable issue and defeat a motion for summary judgment merely by resting on allegations and unsupported assertions."). Plaintiff may not defeat Defendant's motion for summary judgment—or prevail on her own—without presenting evidence to support an alternative causation theory. *See Kay-Woods*, 622 F. Supp. 2d at 708 (granting summary judgment for life insurance company that denied accidental life insurance benefits based on decedent's participation in a DUI-related offense, because plaintiff produced no evidence whatsoever to support her alternative theories of causation—for example, that a deer leaped in front of his car, or that he died of natural causes).

Because the undisputed evidence indicates that Ms. Runion was intoxicated with oxycodone at the time of the collision, and that this intoxication contributed to her death, the intoxication exclusion applies. Benefits are not therefore payable under the plain language of the policy.

### 2. Being under the influence of a narcotic

Plaintiff's claim for benefits is also precluded by another provision of the intoxication exclusion: being under the influence of a narcotic. This provision prohibits the award of benefits where the insured was under the influence of any narcotic, which contributed to the loss. The narcotic provision will not apply, however, if the drug was taken under the direction of and as directed by a physician. Plaintiff argues that it is impossible to determine whether Ms. Runion ingested the oxycodone under the direction of a physician, and therefore Defendant cannot meet its burden of demonstrating that Ms. Runion's loss falls within this exclusion. The Court disagrees.

It is undisputed that Ms. Runion received a single prescription for oxycodone, which was filled more than ten months prior to her death.[7] The prescription was for 40 pills—a three days' supply—each containing 5 milligrams of oxycodone. ECF No. 24-9. As Defendant's own expert acknowledges, "there is no way of knowing whether the [o]xycodone Ashleigh Runion ingested in the hours before her death were from the prescription she was given on August 15, 2009, or whether she acquired the [o]xycodone elsewhere." ECF No. 25-3 ¶ 6. Even if the Court were to draw the inference that the oxycodone in Ms. Runion's bloodstream came from the lawful prescription she received in August 2009, the analysis does not end there. Under the plain language of the policy, being under the influence of a narcotic will trigger the exclusion unless the narcotic is taken under the direction of *and as directed by* a physician. While it is possible that Ms. Runion ingested the oxycodone pursuant to a prescription (and therefore "under the direction" of a physician), the evidence shows that Ms. Runion did not take the drug *as directed by* a physician.

---

[7] This does not include the oxycodone doctors administered at the hospital during childbirth.

12

The physician's dosage instructions are not in evidence. Dr. Poklis, however, stated that Ms. Runion's blood concentration indicated "the acute ingestion of at least 100 mg" of oxycodone. This amount of oxycodone would equal twenty pills from the August 2009 prescription, under which each pill contained 5 mg of oxycodone. The acute ingestion of twenty pills is incompatible with the physician's prescription for forty pills to last three days. Dr. Poklis and the chief toxicologist agree that the blood concentration reflecting a therapeutic dose is approximately 0.10 mg/L. Ms. Runion's blood concentration was nearly three times that amount. The evidence demonstrates that Ms. Runion was not taking oxycodone *as directed by* a physician, even if she did have a valid prescription for the drug.

For the reasons discussed *supra*, the evidence demonstrates that Ms. Runion's ingestion of the narcotic oxycodone contributed to her death. The Court concludes that Ms. Runion was under the influence of oxycodone, a narcotic, which contributed to her death in an automobile collision. The policy exclusion therefore applies and precludes the payment of benefits.

### III.   CONCLUSION

This is undoubtedly a tragic case, involving the loss of two young lives. The life insurance policy at issue in this case, however, is clear and unambiguous. For the reasons discussed above, the Court concludes that Defendant's policy explicitly excludes from coverage accidental death benefits under the circumstances presented in this case. Defendant's denial of accidental death benefits was not wrongful. Accordingly, the Court **GRANTS** Defendant's motion for summary judgment on Count One of the complaint and **DENIES** Plaintiff's motion for summary judgment.

Pursuant to the parties' request, the proceedings in this action were bifurcated such that discovery and dispositive motions were permitted first on Plaintiff's claim for declaratory

judgment. That claim now being resolved, the Court **DIRECTS** the parties to conduct another Rule 26(f) planning meeting regarding Plaintiff's remaining claim, and to submit the report of that meeting no later than **July 19, 2013**.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER: July 3, 2013

ROBERT C. CHAMBERS, CHIEF JUDGE